Filed 2/4/22  In re V.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re V.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077584 |
| Plaintiff and Respondent, | (Super.Ct.No. J283436) |
| v. | OPINION |
| C.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Jesse McGowan, under appointment by the Court of Appeal, for Defendant and Appellant.

Steven O'Neill, Interim County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

C.C. (mother) appeals from orders terminating her parental rights to her son V.C. (the child) and freeing the child for adoption. Mother argues: (1) substantial evidence does not support the juvenile court's earlier finding, before it terminated mother's family reunification services, that the San Bernardino County Children and Family Services (CFS) had offered her reasonable services; and (2) the court erred by denying her petition to vacate the order terminating services and to order CFS to offer her additional services. We find no error and affirm.

I.

FACTS AND PROCEDURAL BACKGROUND

*A.    Detention.*

The day after mother gave birth to V.C.,[1] CFS responded to the hospital to investigate an allegation that mother had consumed alcohol and drugs during her pregnancy. The referral also indicated mother had mental health issues, father (who is not a party to this appeal) suffered from schizophrenia, and the parents resided in a motel room and lacked proper provisions to care for the newborn. Although she and the child tested negative for alcohol and drugs, mother admitted to the social worker that she had an outstanding arrest warrant for driving under the influence of alcohol (DUI), she had a history of substance abuse and had "'done every drug under the sun,'" and she had "used THC during her pregnancy," as recently as "'four days ago'" (i.e., two days before giving birth to the child). Mother said she had been attending Narcotics Anonymous meetings

---

[1] In the petition and during most of this proceeding, the child was named R.C. Sometime later, the child's name was changed to V.C.

2

and a mental health clinic to address her substance abuse, post-traumatic stress disorder (PTSD), and anxiety. She declined the social worker's offer of information about substance abuse counseling. The parents admitted to domestic violence in their relationship.

The next day, during a scheduled visit to mother's residence, the maternal grandparents told the social worker they were not concerned about mother's failure to take medication prescribed to address her mental health issues but indicated they "'want[ed] her to get on her meds.'" Back at the hospital, nurses told the social worker that mother had not fed or changed the child's diaper since giving birth. Mother told the social worker she had not received mental health services for two years because she had aged out of a youth program, and she declined the social worker's offer of a referral to services. Mother said, "'[I]f I need help, I will get some.'"

Six days later, Riverside County Sheriff's deputies responded to the family's home after a witness reported seeing mother slam the child's car seat, with the child in it, into a wall. The child received no injuries, but mother was placed under arrest for being under the influence of methamphetamine and for misdemeanor child endangerment. A deputy informed the social worker that father was homeless, had severe untreated mental illness, and could not care for the child.

The maternal grandmother told the social worker that, earlier in the day, before her arrest, mother had taken the child to a clinic for a checkup. When informed of the importance of getting the child vaccinated, mother became upset, refused to get the child vaccinated, and left the clinic. The grandmother reported she then took mother and the

3

child to the hospital to finalize the child's name, but mother started acting "'wacky,'" talked to herself, said she thought she was being followed, and said "satellites were watching her." The grandmother told the social worker she believed mother had undiagnosed schizophrenia, but mother had not sought mental health services because "'she doesn't think she has a problem.'" She also told the social worker that mother had consistently used methamphetamine for five years but stopped using after learning she was pregnant. The grandmother was concerned the child might be neglected or accidentally injured because of mother and father's untreated mental health issues and father's bad temper. CFS detained the child after concluding he was at significant risk of neglect or abuse.

The social worker spoke to a nurse at the hospital the next day. The nurse said that, when mother was finalizing the child's name, she "'became upset with the conversation'" and "'said she was going to kill herself if they didn't get it right.'" As she was leaving the hospital, mother was visibly upset and hit a wall with the car seat she was carrying, with the child in it.

In a petition filed with the juvenile court, CFS alleged the child was a dependent within the meaning of Welfare and Institutions Code[2] section 300, subdivisions (b)(1) and (g). CFS alleged mother and father's ongoing substance abuse and mental health issues limited their ability to adequately care for the child and placed the child at substantial risk of suffering serious harm or illness. Finally, CFS alleged the child had

---

[2] All additional statutory references are to the Welfare and Institutions Code.

4

been left without any provisions for his support because of mother's arrest and incarceration and father's unknown whereabouts.

The juvenile court found a prima facie showing had been made that the child was a dependent within the meaning of section 300 and ordered him detained out of the parents' care and custody. The court ordered the parents to submit to random and/or same day drug testing and directed CFS to develop a case plan and provide supervised visits with the child once a week for two hours.

B.     *Jurisdiction and Disposition.*

In a report for the jurisdiction and disposition hearing, CFS recommended the juvenile court (1) sustain the allegations under section 300, subdivision (b)(1), because the parents' ongoing substance abuse and mental health issues placed the child at substantial risk of neglect or abuse; (2) dismiss the allegations under section 300, subdivision (g), as unsupported by the evidence; (3) order that the child remain detained in his current placement with the maternal grandparents under the supervision of CFS; (4) offer the parents family reunification services as outlined in their case plans, and (5) provide supervised visits once a week for two hours.

During the reporting period, the social worker interviewed mother. Mother said she suffered from anxiety and had been diagnosed in 2017 with PTSD. The next year, mother was involuntarily detained under section 5150 when she was under the influence of "'Bath Salts.'" She was discharged and prescribed medications, but she "'did not like taking them and stopped.'" Despite her arrest for DUI, mother said she did not like to drink alcohol. Mother admitted that she started smoking marijuana when she was 15

5

years old and snorting methamphetamine when she was 17 years old. She told the social worker she stopped using methamphetamine after she learned she was pregnant, but she continued to smoke marijuana during her pregnancy. Mother told the social worker she was "frustrated and overwhelmed" and angry at the maternal grandmother when she hit the child's car seat against a wall. The social worker reported that mother said after she admitted violating her probation by driving under the influence, the pending DUI charge was subsequently dismissed.

Mother agreed to attend an outpatient substance abuse program, 12-step meetings, submit to random drug tests, complete parenting and anger management courses, participate in therapy, and take medication to manage her mental health needs if recommended. The objectives of mother's case plan included "[c]omply[ing] with medical or psychological treatment."

At the hearing, the juvenile court sustained the petition but dismissed the allegations under section 300, subdivision (g), declared the child to be a dependent of the court, and ordered the child removed from the parents' care. Mother's counsel indicated mother had agreed to submit to drug tests and to be referred to an outpatient program if she failed to test or tested positive. The juvenile court approved the case plan as so modified and directed CFS to offer reunification services to mother and for mother to participate in them.

C.     *Six-month Review Hearing.*

For the six-month review hearing, the social worker recommended the juvenile court continue reunification services to the parents for another six months and order that

6

visitation remain supervised. The social worker reported mother was unemployed, resided in a motel, and relied exclusively on the child's father and the maternal grandparents as her safety network. Mother had been referred to individual counseling services, anger management and parenting courses, and had been participating in random drug testing. The social worker reported mother was participating in 12-step meetings and had identified a sponsor. She also had completed eight counseling sessions, six parenting classes, and six anger management classes before they were put on hold due to the COVID-19 pandemic. Mother also regularly tested for drugs, and she had not missed a test or tested positive.

Based on the therapist's recommendation, the social worker recommended mother be psychologically evaluated and undergo a psychotropic medication assessment. Mother stated she had completed a "telehealth mental health evaluation" and had been prescribed and was compliant with taking medication for her attention deficit hyperactive disorder (ADHD), so she did not feel she needed additional mental health assessments or counseling. However, the social worker recommended mother continue to receive counseling to meet the goals of her case plan and undergo a psychological evaluation.

In addition, the social worker was still concerned about the benefits mother was receiving from her services. Mother denied the allegations in the petition and did not accept that she had placed the child at risk. Instead, she said the social worker's prior reports were untrue, and she blamed the child's removal from her care on the social worker's dishonesty. Mother responded to direction and guidance from the social worker

7

by becoming and angry and argumentative. The social worker opined, "It is important that the mother address her mental health."

The parents participated regularly in supervised visitation during the reporting period and had not missed any scheduled visits. The social worker reported that, during one visit, mother started yelling at the child's caregivers and claimed there was something wrong with the child's head. The caregivers took the child from mother when she pressed on his head and would not stop. The social worker asked the caregivers to leave the room with the child. After mother calmed down, the caregivers came back into the room and gave the child to mother. Mother once again started to press on the child's head, so the social worker ended the visit. An inspection of the child showed he had a small spot on his head called a fontanel, which is normal for a small child. The remaining visits were without incident, though the caregivers reported mother became distracted during visits and required redirection and intervention.

The child was up-to-date on his immunizations and was healthy and doing well in his placement with the maternal grandparents.

At the hearing, the juvenile court indicated it needed to order psychological evaluations of the parents. Mother's counsel requested unsupervised, overnight, and weekend visits. Counsel submitted certification that mother had completed her parenting courses. In addition, counsel informed the court that mother had already completed a psychological evaluation and had been prescribed medication for bipolar disorder and ADHD. Counsel indicated mother was "currently medically compliant" and, other than one remaining anger management class, she had completed all of her services. Therefore,

8

counsel asked that CFS "work on a transition plan" to return the child to mother as quickly as possible.

Counsel for the child acknowledged the parents had been participating in their services but said, "[T]he big question is benefit." Counsel agreed with liberalized visitation for mother but indicated "there's some questions about her benefit." Counsel for CFS agreed the issue "seems not to be participation but benefit." Counsel stated, "I think for Mom the reasons they [(CFS)] want to do another psychological evaluation is because there is such a lack of benefit."

The juvenile court found by clear and convincing evidence that CFS had offered reasonable reunification services to the parents. The court found that the parents had participated in their services, but their progress toward alleviating the reasons for the dependency had been moderate. Therefore, the court continued the child in his placement and ordered CFS to provide the parents with reunification services for an additional six months. The court authorized CFS to psychologically evaluate the parents and provide unsupervised, overnight, and weekend visits with the child.

*D.      Twelve-month Review Hearing.*

In the report submitted for the 12-month review hearing, CFS now recommended the juvenile court terminate reunification services and set a hearing under section 366.26 for selection of a permanent plan for the child.

Mother continued to participate in reunification services during the reporting period. She had participated in a 12-step program, completed her anger management course, consistently tested negative for drugs, and visited the child regularly. Although

9

mother said she had monthly telehealth mental health appointments with a psychiatrist to refill her medications and she had been compliant with her medications, her behavior during the reporting period demonstrated she continued to experience mental health issues, which hindered her ability to adequately care for the child.

During the reporting period, the child was diagnosed with a heart defect that required surgery. When informed of this, mother said there was nothing wrong with the child, and he merely needed antibiotics. Mother initially refused to provide consent for the surgery because she did not want him to have a scar. She finally consented on the day the surgery was scheduled, but the same day she told the social worker she knew of an alternative treatment and expressed her fear "that the government was placing a chip inside the child, and he would be monitored for the rest of his life." After the surgery, mother said she did not want to visit the child because she did not want to see the scar. The social worker opined mother lacked "insight and judgment" about the child's needs. Mother was very hesitant about submitting to a psychological evaluation because she feared she would be prescribed medications "that are 'ordered by the government.'" And the child's caregivers reported that mother displayed paranoia—she believed "the government is listening to her," so she changed her telephone number often. During visits, mother said she was being followed.

Mother was also very inconsistent about her willingness to participate in mental health services. On numerous occasions, she told the social worker she did not want to receive such services. But, she also said she needed six more months of services to

address her mental health issues, which would enable her to transition to unsupervised visitation.

Mother did make herself available for a psychological evaluation. During the evaluation, mother exhibited disorganized speech and often inserted "odd and bizarre words in the middle of sentences." She made paranoid and delusional statements, and expressed persecutory delusions involving the government and other entities robbing her, following her, and interfering with her life. Mother appeared frustrated at times and seemed to avoid certain topics. For instance, she evaded questions about whether she experienced hallucinations, which caused the evaluator to conclude she likely experienced them but did not want to disclose it. The evaluator said mother lacked insight into her mental illness. Mother did eventually admit to hearing voices and seeing things that were not there. Although mother, for the most part, openly discussed her history of substance abuse, she changed the subject when asked if she was a drug addict, which further demonstrated lack of insight.

Although mother expressed no paranoid or delusional thoughts about the child, the evaluator concluded that "it is possible that under the right circumstances she could potentially put her child's safety at risk, because the nature and content of her *untreated* paranoia and persecutory delusions could make her respond to people and life situations in ways that can be unpredictable and unsafe." The evaluator recommended mother be treated with antipsychotic medications and mood stabilizers, and receive individual therapy including behavioral strategies to manage paranoia, mania, delusion, and substance abuse recovery.

11

The social worker opined mother continued to experience mental health issues that interfered with her ability to adequately care for the child, and it was unlikely those issues would be resolved in the short term such that the child could be returned to her care during the statutory time frames.

After the juvenile court continued the 12-month review hearing, mother informed the social worker that she had begun seeing a private psychiatrist and had enrolled in an outpatient substance abuse program because she wished to be the child's sole caregiver. When informed that the recommendation was to terminate her reunification services, mother said, "'Well, I want to continue my case plan.'"

In an addendum report, the social worker reported mother's case plan required her to undergo a medication evaluation. When the social worker tried to discuss the evaluation with mother, she "became extremely upset" and said she was not taking medication because it is "poison." Nonetheless, mother later told the social worker she would seek her own medication evaluation and reported being evaluated by a psychiatrist over the telephone and being prescribed medication for her ADHD. The social worker referred mother back to the same psychologist who had previously evaluated her. The psychologist recommended mother undergo another medical evaluation because she "was currently not on the appropriate medication to treat her mental health issues." The psychologist also recommended mother have weekly therapy sessions. Mother once more told the social worker she would find her own private psychiatrist to evaluate and testify for her. Mother also said she did not understand why she needed another medical evaluation because she was already taking medication for her ADHD. Later, mother told

12

the social worker she had been evaluated and prescribed a new medication, which she would start taking soon. Mother continued to visit with the child without incident, though the child's caregivers once more reported mother displayed paranoia and required a high level of supervision.

The social worker expressed concern that, notwithstanding she had received services for one year, mother still required a high level of supervision, guidance, and direction during visits. Her lack of progress meant the social worker could not recommend liberalized visitation or transition to mother's care. And, because mother was unwilling to acknowledge she continued to suffer mental health issues, the social worker opined it was not reasonably likely she would adequately address those issues with an additional six months of reunification of services.

Mother was not present for the continued 12-month status review hearing. Her attorney objected to the recommendation that services be terminated and asked that the court order an additional six months of services. Counsel stated mother was enrolled in an outpatient substance abuse program, had begun attending therapy a second time, and was taking her medications. Counsel argued, "[T]his shows Mother's ability to not only engage in services, but to benefit from them [and] to be open to continuing to work on her journey to get to a place where she's stable mentally." Counsel also stated the social worker's reports had been "a little unfair to Mother." According to counsel, mother did not strictly oppose surgery for the child, but had merely expressed the desire that a less invasive procedure be explored. In addition, counsel argued the reports mischaracterized mother's visits.

13

Counsel for the child stated he was in complete agreement with the social worker's recommendation. He stated there was no debate that mother loved the child, she had proven her sobriety, and she had completed their programs. The only issue was whether mother had benefited from her services. "I think the evidence shows that there's a lack of benefit for both parents that will allow them to care for [the child], a medically fragile child, without there being risk." Counsel for CFS agreed.

The juvenile court found by clear and convincing evidence that mother had been offered reasonable reunification services, but she had not made substantive progress on her case plan. The court stated, "I cannot, under any circumstances, make a finding that return is probable, much less even possible," with an additional six months of services. "While the parents have demonstrated some benefit, it's certainly not to the extent that they could parent this very young child who has the medical issues that he has." Therefore, the court terminated mother's reunification services and set a hearing under section 366.26.

E.    Section 366.26 Hearing and 388 Petition.

In the report for the section 366.26 hearing, the social worker reported the child was recovering well from his surgery, he had bonded with and adjusted to his caregivers, and he was likely to be adopted by them. The recommendation was to terminate parental rights and free the child for adoption.

Mother, acting as her own attorney, filed a petition with the juvenile court pursuant to section 388, requesting the court (1) vacate its orders terminating reunification services and setting a section 366.26 hearing, and (2) give her a "chance to

14

reunify" with her son, by which she presumably meant she wanted an additional six months of services. She alleged circumstances had changed because (1) she had begun taking medication in the evenings, which helped her sleep better, (2) she had lived in a sober living facility for several months, (3) she continued to follow her case plan and had completed all her services, and (4) she now owned a home. According to mother, granting her additional services would be in the child's best interest because it would allow the child "[t]o live healthy and grow with his Mother," "[a]ll his needs [would be] securely taken care of," and "be[ing] with his biological mother . . . will make both of us grow best into the best people possible." The juvenile court concluded mother had not shown changed circumstances or that additional reunification services would be in the child's best interest, so it denied mother's section 388 petition.

During the section 366.26 hearing, mother testified she visited with the child regularly. During visits, mother played with the child, read to him, fed him, and changed his diaper. The child recognized mother and was peaceful, calm, and happy when he saw her. He was affectionate with mother and gave her hugs and kisses. The child had also reached to mother for comfort. When asked about her bond with the child, mother testified that "it's the most important relationship for me." On cross-examination, mother admitted her visits had always been supervised by the child's caregivers.

Mother's attorney objected to termination of parental rights and requested the juvenile court consider the lesser plan of legal guardianship. Counsel argued mother had maintained consistent and positive contact with the child since his removal and asked the court to maintain the parental bond. Counsel for the child told the court there was no

15

doubt mother loved the child and had regular and appropriate visits. However, counsel questioned the strength of the child's bond with mother. The child was removed from mother when he was only one week old and had been in the same placement since then. Mother's visitation had never progressed beyond supervised visits. "[The child], for all intents and purposes, sees his maternal grandparents as his parents. They have been his primary caregivers for the vast, vast majority of his lifetime." In addition, counsel argued it would not be in the best interest of the child to maintain the parental relationship. Therefore, counsel asked the court to follow CFS's recommendation and free the child for adoption. Counsel for CFS argued the child was generally and specifically adoptable, and argued that the evidence showed mother was essentially a friendly visitor with the child and did not occupy a parental role in the child's life. The security and permanency the child would gain from adoption outweighed the benefit from a continued parental relationship, so counsel urged the court to follow CFS's recommendation.

Although the court acknowledged mother loved the child very much and maintained consistent and positive contact with him, it noted the child had been removed shortly after birth, and mother's visits had remained supervised throughout the dependency. "It's the grandparents who really have been acting in a parental role." The court found any detriment to the child from termination of parental rights would be outweighed by his need to permanency and the benefits he would receive from adoption. Therefore, the court terminated mother's parental rights and freed him for adoption.

Mother timely appealed.

II.

DISCUSSION

*A.      Substantial Evidence Supports the Juvenile Court's Finding at the 12-month Review Hearing that CFS Had Offered Mother Reasonable Reunification Services.*

When the juvenile court terminated mother's reunification services and set a hearing under section 366.36, it found, by clear and convincing evidence, that CFS had offered mother reasonable services.  Mother claims that finding is not supported by substantial evidence.[3]  We disagree.

"As a general rule, when a child is removed from parental custody under the dependency statutes, the juvenile court is required to provide reunification services pursuant to section 361.5 to 'the child and the child's mother and statutorily presumed father.'  (§ 361.5, subd. (a).)  The purpose of these reunification services is 'to facilitate

---

[3]  Mother did not timely petition this court for an extraordinary writ when the juvenile court set a hearing pursuant to section 366.26.  (See Cal. Rules of Court, rules 8.450, 8.452.)  Normally, failure to timely challenge such an order by writ precludes the parent from challenging, in a later appeal from an order terminating parental rights, any ruling made at the setting hearing, such as the juvenile court's finding that reasonable services had been offered to the parent.  (§ 366.26, subd. (*l*)(1), (*l*)(2); *In re A.A.* (2016) 243 Cal.App.4th 1220, 1239.)  However, the parties agree mother is not so precluded here. We, too, agree.  Although the clerk of the juvenile court mailed written notice of mother's right to challenge the setting order, as directed by the juvenile court (see Cal. Rules of Court, rule 5.590(b)(2)), the United States Postal Service returned the notice as undelivered, and the mailing address on the envelope does not match the address mother had provided to the juvenile court.

In addition, we reject CFS's assertion that, by not objecting at the 12-month review hearing that reasonable services had been offered to her, mother forfeited her claim of error on appeal.  As mother contends, it is well settled that a substantial evidence challenge "'is an obvious exception to the rule'" that issues not raised in the juvenile court are forfeited on appeal.  (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464; see *In re Taylor J.* (2014) 223 Cal.App.4th 1446, 1448, fn. 1.)

the return of a dependent child to parental custody.' (*In re Jodi B.* (1991) 227 Cal.App.3d 1322, 1326 . . . , italics omitted; see *In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478 . . . [purpose of reunification efforts is to 'eliminate the conditions leading to loss of custody and facilitate reunification of parent and child' thereby furthering the 'goal of preservation of family, whenever possible'].)" (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281.)

"At each review hearing, the court is required to determine the 'extent of the agency's compliance with the case plan' in making reasonable efforts to return the child to a safe home." (*In re A.G.* (2017) 12 Cal.App.5th 994, 1000-1001, quoting § 366, subd. (a)(1)(B).) A juvenile court may not terminate reunification services and set a hearing under section 366.26 unless the court finds by "clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (g)(1)(C)(ii).) "'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.'" (*In re M.F.* (2019) 32 Cal.App.5th 1, 14.) The court's finding that reasonable services have been offered is reviewed for substantial evidence. (*Ibid.*)

"[A]n appellate court must account for the clear and convincing standard of proof when addressing a claim that the evidence does not support a finding made under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true. In conducting its review, the court must view the

record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

"To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'" (*In re A.G.*, *supra*, 12 Cal.App.5th at p. 1001.) The reunification plan must have addressed the specific conditions that led to the child's removal, and it must have been "based on the particular family's 'unique facts.'" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.) In other words, reasonableness of services is judged according to the specific circumstances of each case. (*Id.* at p. 697; *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1159.) Likewise, the juvenile court's authority to terminate services is dictated by "the circumstances presented." (*In re Aryanna C.* (2005) 132 Cal.App.4th 1234, 1242.)

Mother contends the juvenile court erred by concluding CFS had offered her reasonable reunification services because CFS failed to arrange for mother to be evaluated for psychotropic medication, failed to continually refer her to individual counseling, and delayed two months in submitting a referral for her psychological evaluation. But, as CFS contends in its brief, the social worker did make efforts

19

throughout the dependency to refer mother to appropriate services but mother resisted those referrals or delayed them by insisting on pursuing services on her own.

Mother relies heavily on *In re K.C.* (2012) 212 Cal.App.4th 323. Unlike the "stale expressions of reluctance" by the parent to engage in services that the *In re K.C.* court found did not excuse the social service agency from offering services (*id*. at p. 332), in this case, mother's reluctance to meaningfully participate in mental health services was consistent. Before the detention, mother declined offers to refer her to mental health services and said she would seek services if she felt she needed them. After the detention, mother agreed to participate in mental health services and to take medication if recommended. But, when a therapist recommended that she be evaluated psychologically and undergo a psychotropic medication evaluation, mother resisted being referred. She said she had already completed a telehealth mental health evaluation and had been prescribed medication for ADHD. She did not believe she needed any additional assessments or counseling. Her attorney resisted additional referrals at the six-month review hearing, but the juvenile court ordered mother to be psychologically evaluated anyway.

During the next six months, mother continued to insist that her treatment by a psychiatrist and medication for ADHD was all she needed, and she resisted being referred for a psychological evaluation because she did not want to be prescribed medication by the government. She made inconsistent statements to the social worker about whether she wished to receive additional services. After the social worker recommended services be terminated because it was unlikely the child would be returned to mother even if

20

services were offered for an additional six months, mother expressed a desire to continue participating, but with a private psychiatrist, and not with a provider to whom she might be referred by the social worker. When the social worker tried to discuss mother undergoing a medication evaluation, mother resisted and said she did not want to take medication, which she said was "poison." Instead, she sought her own private psychiatrist to refill her ADHD medication.

As even the court in *In re K.C.* recognized, a parent's unwillingness to cooperate in the completion of her reunification plan is an appropriate consideration when determining whether the services that were offered were reasonable. (*In re K.C.*, *supra*, 212 Cal.App.4th at p. 330.) Viewing the record in its totality, we conclude substantial evidence supports the juvenile court's finding by clear and convincing evidence that CFS complied with its duty to offer mother reunification services that were reasonably calculated to reunite her with the child.

### B. Section 388 Petition.

Last, mother argues the juvenile court abused its discretion by denying her petition under section 388. Again, we disagree.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child. [Citation.] Generally, the petitioner must show by a preponderance of the

21

evidence that the child's welfare requires the modification sought." (*In re A.A.* (2012) 203 Cal.App.4th 597, 611-612.)

"A petition for modification is 'committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.]' [Citations.] ' . . . "[']The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'"'" (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116-1117.) "The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

"It is true a parent and a child share a fundamental interest in reuniting up to the point at which reunification efforts cease. [Citation.] However, the interests of the parent and the child have diverged by the point of a [section 366.26] hearing to select and implement a child's permanent plan. [Citation.] '[C]hildren have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point

22

'the focus shifts to the needs of the child for permanency and stability' [citation] . . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

"'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] "'[C]hildhood does not wait for the parent to become adequate.'"'" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)

Mother contends the documents attached to her petition demonstrated she had made a prima facie showing of changed circumstances. But, although changes in her medication and living situation appear to have stabilized mother's mental state, nothing in those medical records supports the conclusion that mother's mental health issues were being managed in a sufficient manner so that the child could safely be returned to her within the statutory period. At most, those records indicate mother had finally started to seriously address her mental issues with the right medication. The record indicates mother had suffered from mental health issues for many years, even before the child was born. Mother's belated treatment merely demonstrated her circumstances were changing for the better, not that they had changed.

Nor do we agree with mother that an evidentiary hearing was required to determine whether the child would have benefited from mother receiving an additional six months of reunification services. In her petition, mother alleged, rather vaguely, that

23

the child would benefit from being reunited with his biological mother. Arguably, the same can be said in every case, but section 388 requires a more specific showing of benefit.

And, mother's testimony at the section 366.26 hearing, although focused on the parent-child beneficial interest exception, demonstrates the opposite is true here. The child was removed from mother's care a few days after his birth. He was never returned to mother's care, and he remained in the same home throughout the case. Mother visited the child regularly and, with some exceptions, the visits were appropriate and positive. Mother testified she played with the child, read to him, fed him, and changed his diapers. But the visits never progressed from supervised to unsupervised, overnight or weekend visits. And, throughout the proceedings, the caregivers reported mother required a high level of supervision and direction during visits. Mother testified the child was affectionate and happy to see her. But, mother failed to demonstrate the strength of the bond the child had with her. Given the demonstrated strength of the bond between the child and his caregivers, and the child's need for stability and permanency, we cannot say the juvenile court abused its discretion by concluding that providing mother with an additional six months of reunification services would not be in the child's best interest.

## III.

## DISPOSITION

The order terminating mother's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER
Acting P. J.

We concur:


MILLER
J.


CODRINGTON
J.